FILED

OCT 15 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

Adrian Melgoza,

Petitioner,

v.

Richard Kirkland,

Respondent.

NO. C 06-04861 EJD

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

## I. INTRODUCTION

This matter is now before the Court for consideration of Adrian Melgoza's ("Petitioner") Petition for Writ of Habeas Corpus under 28 U.S.C. §§ 2251 and 2254[1] concerning his 2001 conviction in Santa Cruz County Superior Court. For the reasons set forth below, the Petition is DENIED as to all claims. In addition, no certificate of appealability will be issued for Petitioner's claims.

## II. BACKGROUND

### A. Facts

The California Court of Appeal summarized the facts and trial history of Petitioner's case as follows:[2]

[1] (Petition for Writ of Habeas Corpus, hereafter, "Petition," Docket Item No. 1.) Petitioner filed the Petition in *pro per*. However, on November 5, 2008, as part of his Appeal to the Ninth Circuit of this Court's Order Dismissing the Petition, the Ninth Circuit granted Petitioner's Motion for appointment of counsel. (See Docket Item No. 25.)

[2] People v. Melgoza, No. H023236, 2003 Cal. App. Unpub. LEXIS 10796, at *2-17 (Cal. Ct. App. Nov. 14, 2003) (unpublished), hereafter, "Appeal."

On August 23, 1998, around 10 p.m., Alejandro Lopez sat in his parents' red Camaro talking with his girlfriend, Esmeralda Sanchez. They were parked in a vacant parking lot next to the Kennedy Youth Center in Watsonville. A pickup truck with two people inside drove by them, slowed, and drove to the back of the parking lot. The truck then returned, pulling up next to the driver's side of the Camaro. The passenger began talking to Lopez in Spanish, asking him if he had any marijuana. Lopez said he did not. The passenger asked Lopez his name, and Lopez responded, "Alex." The passenger in the truck asked Lopez "Que eres," which Sanchez understood to mean "what gang are you from." Lopez replied he was not anything, meaning he was "not part of any gang" and that he was just there talking with his girlfriend. Sanchez was frightened, and glanced at the passenger. She was slumped down between the bucket seats huddled closely to Lopez. Sanchez heard the passenger repeat "que eres," and three rapid gunshots. Lopez was hit twice in the torso, perforating his heart, and once in the wrist. He started the car and drove in reverse, crashing into the wall of the Kennedy Youth Center. Sanchez tried to drive the car but could not move it.

Sanchez ran across the street to a pay telephone and called 911. Deputy sheriffs arrived as she spoke to the dispatcher, followed by paramedics and the police. Lopez died at the scene. Sanchez was crying hysterically and covered in blood. The sheriff's deputies interviewed her briefly at the scene and then at the sheriff's office in Santa Cruz. Sanchez described the passenger in the truck and the truck with a distinctive primer spot. The next day, she worked with a sheriff's sketch artist to prepare a composite sketch of the shooter. When they finished, Sanchez was positive that it accurately portrayed the passenger.

Sheriff's deputies found three expended cartridges at the scene consistent with a .22 caliber weapon, all of which had similar characteristics, indicating they were fired from the same gun.

On August 24, a truck was found abandoned on the roadside south of Watsonville. The truck had Michigan license plates and had been hot-wired. Sanchez thought the primer spot on this truck looked like the one she had seen on the truck the night of the shooting. Fresh peach pits were scattered around the truck. A sheriff's deputy found one unexpended .25 caliber round lying on the truck's right floorboard. Another .22 caliber bullet was lying on the ground outside the truck on the driver's side. This bullet had damage to its head suggesting that the weapon had jammed when an attempt was made to fire it. The truck was eventually returned to its owner who testified at trial that she parked it on the evening of August 22 and noticed it missing the following evening. When it was returned to her, the passenger side window was broken. The truck owner did not own any guns and kept no bullets in the truck. Sheriff's deputies had observed this truck at the Buena Vista labor camp around noon on August 23. Several Hispanic males were around the truck.

A police gang expert testified at trial that the Poorside Watsonville gang (PSW) was a Sureno gang with about 50 members. Surenos use the numbers three and 13 as symbols. The expert testified PSW was loosely organized and many of the members were heroin addicts. He said the shooting at the Kennedy Youth Center was probably for the benefit of the PSW gang. The expert identified PSW members' involvement in two predicate, violent criminal assaults. A gang member testified no gang member wants to be known as a "rat" or a "snitch."

On August 28, 1998, sheriff's investigators interviewed Juan Carlos "Flaco" Rocha. Rocha was in jail for a parole violation charge, and offered to trade information about the Lopez murder in exchange for his freedom. Rocha was 27 years old and had been a member of the PSW gang since he was 15. Rocha told the deputies that a fellow PSW gang member

United States District Court

For the Northern District of California

had stolen a truck from Santa Cruz.  He said he had heard the truck was used in a drive-by shooting.  He said "Shyboy" from the Buena Vista labor camp stole the truck.

"Shyboy" is Rafael Bernabe, who was arrested August 30, 1998.  Officers found property they believed was stolen from the truck at his residence.  Bernabe admitted stealing the truck, and his palm print was on the broken passenger's side window.  He said he abandoned it in Watsonville around 4:00 p.m. on August 23, 1998.  On September 1, 1998, Sanchez attended a lineup that included Bernabe.  She was unable to identify him.  She did circle one person's number as resembling the passenger, but did not think that person was actually the passenger.  Bernabe did not look like the passenger to her.  Appellant was not in the lineup.

In the days after the shooting, Sanchez's sister, Alma Pinon talked to Sanchez about the Lopez murder.  Pinon knew that she and Sanchez had a half-brother from their father's affair with another woman.  The half-brother was Mario "Shaggy" Rodriguez and Pinon knew he associated with PSW gang members.  Pinon went looking for Rodriguez, eventually running across him at the YMCA.  She asked him if he knew anything about the Lopez killing.  He said that he did, but that he did not want to tell her about it there.  He agreed to meet with her and Sanchez later.

On September 5, 1998, in a shopping mall parking lot, Pinon and Sanchez parked their van in the back so fewer people could see them.  Rodriguez arrived and got in the back seat.  Pinon introduced Rodriguez to Sanchez, who did not know him.  Rodriguez said his mother had told him about what happened to Sanchez and Lopez.  At trial, Pinon testified "then [Rodriguez] said that he knew who had done it."  Sanchez and Pinon offered Rodriguez $ 2,000 to tell them what he knew about the killing and offered to help him "get out of Watsonville."  Pinon testified Rodriguez said "that he didn't want the money, that the money was nothing for him, that we were his sisters, we were his blood, and he cared more about us than what he cared about them."  Rodriguez kept looking nervously out the windows of the van.  He made his half-sisters promise that they would not identify him to the authorities.

Pinon testified Rodriguez told them there had been a "junta," a gang meeting.  A hat was passed to collect money to buy a gun to do a "jale" or job.  Three people wanted to show "they were down for the barrio."  A truck had been stolen the night before.  Pinon testified Rodriguez mentioned three names, including "Gonzo" and the first name "Adrian."  Later, Sanchez believed Rodriguez had told them that appellant had been the shooter, but Pinon testified she did not remember whether Rodriguez said how each of the three was involved.  Sanchez testified Rodriguez told them he saw appellant with a gun and that appellant had been "the passenger in the truck the day of the shooting."  He told them he did not know who had been the driver.

Pinon testified concerning a statement Rodriguez attributed to appellant.  On August 30, 1998, Sanchez had attended a public remembrance and mural dedication for victims of gang violence, including Lopez, at the Mona Lisa restaurant in Watsonville.  Pinon testified Rodriguez told Sanchez and Pinon that he was at the Mona Lisa with appellant at the remembrance, and appellant said, referring to Sanchez, "She's going down.  The bitch is going down."

After consulting with Sanchez and Pinon, Sanchez's brother-in-law contacted the sheriff's department and said Sanchez had a source from within the PSW gang who had identified Lopez's killer.  On September 10, 1998, sheriff's deputies contacted Sanchez, but she initially refused to divulge the name of her informant.  Eventually, Sanchez told the deputies that the killer's name was Adrian, that his nickname was "Gonzo," and that her

informant had seen him with a gun. She gave the deputies an address that matched appellant's. She told them her half-brother Rodriguez had provided the information.

On September 10, 1998, appellant, Adrian "Gonzo" Melgoza, was arrested on a warrant for violating probation by associating with gang members. He was interviewed the same day and said he did not recall where he was on Sunday, August 23. He denied any knowledge of or involvement with the homicide. He denied he was a member of the PSW gang or that he had friends who were members. Appellant agreed to participate in a lineup, but Sanchez was "too upset" to go through with it.

On September 17, Sanchez did view a lineup including appellant. She said the shooter had a mustache and appeared thinner than anyone she saw. She later told detectives that appellant and another person looked like the composite sketch. At trial, Sanchez testified that appellant resembled the composite sketch, but she did not identify him as the passenger in the truck. A forensic animation specialist prepared an exhibit using a booking photograph of appellant with a transparency of the composite sketch of the suspect as an overlay. The similarities between the facial features in the sketch and the features in the photo became stronger and stronger as the level of comparison increased. A defense identification expert gave reasons why this was an unreliable technique and said there were notable differences between appellant's face and the features of the composite.

The police contacted Rodriguez and interviewed him once at a juvenile camp and again at the sheriff's office. In these interviews, Rodriguez said the PSW gang held a junta late in the afternoon on August 23, 1998. He said about 20 people attended. At trial, Rodriguez testified the group was determining how to "get payback" from the Nortenos. A hat was passed to collect money for people in jail. Rodriguez said that at a smaller meeting held immediately after the junta, he, appellant and Bernabe discussed the plan, and appellant was the initiator and lead person carrying out the shooting. Rodriguez said appellant produced a gun and said he wanted to use Bernabe's stolen truck to do the jale. In the interviews, Rodriguez said appellant was the only one who had a gun and denied knowing who the driver was. He said he saw two guns in socks that had been hidden in a pipe under the train trestle. Later, investigators found a sock with a magazine loaded with .22 caliber ammunition near the described location.

Rodriguez later told an investigator that Alejandro "Baby" Ramirez, rather than appellant, was the initiator of the plan to do the shooting. Later, Rodriguez said Michael "Shadow" Ramirez was involved and, in April 2000, Rodriguez said Oscar "Blue Eyes" Macias was involved in planning the jale.

Rodriguez was granted full transactional immunity and testified at trial that appellant was part of the small group that planned the shooting and that appellant agreed to assist. He testified they were smoking marijuana and he was "pretty high." Rodriguez testified he did not mention Alejandro "Baby" Ramirez's involvement as the instigator at the jale to the police or during testimony in November 1998. He said Ramirez said he wanted to do a "jale," which has "lots of meanings" including a robbery or a drug deal. He said "Gonzo went with his idea . . . agreed with him." He testified that Juan "Happy" Fernandez told them they should have a plan and Bernabe volunteered his recently stolen truck. Alejandro "Baby" Ramirez then produced two guns "from some bushes." The guns were in socks. Ramirez picked up one and appellant the other. Rodriguez testified that when the meeting broke up, he and Oscar "Blue Eyes" Macias put gas in the stolen truck. Rodriguez admitted during his testimony that everything he testified to at this trial that Ramirez did Rodriguez had previously attributed to appellant in statements to the authorities and prior testimony.

Rodriguez testified that inside the van in the shopping center parking lot he told his sisters "who did it." He testified that he told them "Adrian" did it, that Adrian's nickname was "Gonzo," and that he saw him with a gun. Rodriguez identified appellant in court as "Gonzo." Rodriguez testified that he told his sisters about the junta and about seeing appellant with a gun there. He testified he told them that he thought appellant had committed the homicide. He denied saying anything about a hat being passed and did not remember mentioning to them that a stolen truck would be used.

In late September 1998, Juan "Flaco" Rocha was arrested and told by sheriff's deputies that he could help them with their murder investigation by going to a Sureno unit of the jail and listening to people talk. Rocha was using heroin daily and did not want to be returned to prison for his parole violations. He agreed to help. When he met with a sheriff's deputy a few days later, the "first thing" Rocha asked about was "what was going on with his parole." The deputy said he had not talked to Rocha's parole agent yet because "I gotta know what you have." Rocha told the investigators that appellant had confessed to the Lopez shooting. He said appellant told him he had done a jale using a truck stolen by Bernabe. He said appellant told him he "found someone parked and shot them." Rocha told the investigator appellant said he and another person got out of the truck, and that .38 caliber weapons were used. He said appellant said that there was a female in the car and he would have shot her except the gun jammed. He said appellant told him they left the Kennedy Youth Center when they heard the sound of the ambulance. The information concerning the gun jamming was the first the detectives had heard of this. Rocha told the investigator that appellant referred to Lopez as a "buster," a derogatory term for a Norteno gang member. Rocha was sent to a drug treatment program rather than being returned to prison, but he left the program within two days of the placement.

At trial, Rocha testified that what he told the detectives was what he had heard from others and not from appellant. He testified appellant did not confess to him. Rocha's parole agent testified regarding Rocha's parole violations and that his parole hold was dropped in October 1998 after a sheriff's department official said he was providing useful information to them.

In October 1998, the police searched the home of Michael "Shadow" Ramos and found many rounds of .25 and .22 caliber ammunition. Juan "Little Man" Macedo, a PSW gang member, said that he went to the lake with Alejandro "Baby" Ramirez and Ramos and that Ramos had retrieved a .25 caliber handgun from the lake. Ramos told the police he had thrown the gun into the lake because his friends were being arrested for a homicide and he did not want to get caught with the gun.

In November 1998, testifying before an investigative grand jury, Oscar "Blue Eyes" Macias denied knowing appellant and denied knowing anything about the Lopez shooting. He admitted there had been the PSW meeting on August 23, 1998. Later, after being further interviewed by detectives administering a voice stress analyzer test, Macias told the grand jury that, when the August meeting broke up, appellant told him he was going to do a drive-by shooting. At trial, Macias was granted full transactional immunity for his role. He testified that he lied to the police and told them what they wanted to hear because they were going to send him to prison if he did not implicate appellant. However, he also testified he would never "rat" against his friends unless it was true.

PSW member Jesus "Baby Face" Sandoval testified that a few days before the junta, his cousin Juan "El Charro" Ramirez was attacked and beaten by a group of rival Norteno

United States District Court
For the Northern District of California

gang members at a birthday party at the Kennedy Youth Center. Other gang members mentioned several names as the people who were attacked, but appellant's name was not mentioned.

The owner of Buena Vista Farms in Watsonville testified that his records showed appellant was at work picking strawberries by 7:00 a.m. Monday, August 24. Appellant's father testified that Alejandro "Baby" Ramirez got appellant the job and drove appellant to work. Other testimony established appellant acted normally after he was released from jail on another matter in August 1998 up until his arrest in September and did not change his appearance. The members of the Melgoza family were agricultural laborers, and bedtime was around 10:00 p.m. so they could arise in the morning for work. Ten people lived in their one bedroom apartment to which the children did not have keys.

Appellant's 14-year-old sister testified she had seen her brother with his cousin Alex sitting on the stairs out in front of their home during the afternoon of August 23, 1998. He was there when she and her mother left for Mass at 6:20 p.m. He was out of her sight for a couple of hours that afternoon, and she did not know where he was around 10:00 p.m. that evening.

(Appeal at 2-17.)

**B. Case History**

On February 23 2001, a jury found Petitioner guilty of one count of murder, one count of discharging a firearm at an occupied motor vehicle, one count of discharging a firearm from a motor vehicle, and four counts of conspiracy.[3] The jury also found true special allegations that Petitioner personally used a firearm, that he inflicted great bodily injury and that the crimes were gang related, pursuant to California Penal Code §§ 12022.5, 12022.53, and 186.22. (Id.) On May 11, 2001, the trial court sentenced him to a term of 52 years to life in state prison. (Id.) On November 14, 2003, the California Court of Appeal affirmed the conviction, and the Supreme Court of California denied the petition for review on February 24, 2004. (Id.)

On February 23, 2005, Petitioner, proceeding in *pro per*, filed his original petition for a writ of habeas corpus in this Court. (No. CV 05-0782 JW, Docket Item No. 1.) On May 3, 2006, that federal petition was dismissed without prejudice for failure to pay the filing fee. (No. CV 05-0782 JW, Docket Item No. 4.)

[3] (Answer to Petition for Writ of Habeas Corpus, Ex. 1, Memorandum of Points and Authorities in Support of Answer at 1, hereafter, "Answer," Docket Item No. 45-1.)

On August 11, 2006, Petitioner filed the current Petition. (See Petition.) On June 26, 2007, Respondent filed a Motion to Dismiss the Petition as untimely. (See Docket Item No. 4.) On December 20, 2007, the Court granted Respondent's Motion to Dismiss with prejudice and found that the Petition was untimely. (See Docket Item No. 8.)

On February 22, 2008, Petitioner appealed the Court's dismissal. (See Docket Item No. 13.) On March 26, 2010, the Ninth Circuit reversed the Court's dismissal and remanded the case. (See Docket Item No. 35.) On June 11, 2010, the Court issued an Order setting a schedule for briefing on the Petition. (See Docket Item No. 39.) Since June 2010, the parties both filed a number of requests for extensions of their deadlines, which the Court granted. (See Docket Item Nos. 41, 43, 60, 62.)

On September 4, 2012, this case was reassigned from Chief Judge Ware (Ret.) to Judge Davila.

## III. STANDARDS

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court proceedings unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than deciding the claim on the basis of a procedural rule. Barker v. Fleming, 423 F.3d 1085, 1092 (9th Cir. 2005); Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

**A. "Clearly Established Supreme Court Law"**

Clearly established federal law, as determined by the Supreme Court of the United States refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. See Williams (Terry) v. Taylor, 529 U.S. 362, 412 (2000); Barker, 423 F.3d at 1093. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003). If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law. See Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by the Supreme Court." Williams, 529 U.S. at 391 (referring to case-by-case analysis applicable to ineffective assistance of counsel claims); see, e.g., Jackson v. Giurbino, 364 F.3d 1002, 1009 (9th Cir. 2004). There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." Lockyer v. Andrade, 538 U.S. 63, 64 (2003). When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework. Id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

**B. "Contrary To"**

While the "contrary to" and "unreasonable application" clauses have independent meaning, they often overlap. See Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer, 538 at 70-73 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Early v. Packer, 537 U.S. 3, 8 (2002) (*per curiam*). A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

**C. "Unreasonable Application"**

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13; see also Brown v. Payton, 544 U.S. 133, 141-43 (2005).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; Middleton v. McNeil, 541 U.S. 433, 436 (2004) (*per curiam*); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (*per curiam*) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

The objectively unreasonable standard is not a clear error standard. Lockyer, 538 U.S. at 75-76. After Lockyer, "[t]he writ may not issue simply because, in [the federal court's] determination, a state court's application of federal law was erroneous, clearly or otherwise. While

United States District Court
For the Northern District of California

the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." Clark, 331 F.3d at 1068. Thus, deciding whether the state court decision was unreasonable may require analysis of the state court's method as well as its result. Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).

Finally, habeas relief is warranted only if the constitutional error at issue is a structural error or had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795-96 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

Where, as in this writ, the California Supreme Court denies review of Petitioner's claim without explanation, the Court looks to the last reasoned state court decision in conducting habeas review. See Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citation omitted).

## IV. DISCUSSION

Petitioner moves for a writ of habeas corpus on the grounds that: (1) the magistrate judge who issued the arrest warrant and denied bail was neither neutral nor detached; (2) the admission of inadmissible hearsay at Petitioner's trial rendered it fundamentally unfair in violation of Petitioner's Due Process and Confrontation Clause rights; and (3) the admission of coerced out-of-court statements by third-party witness Macias, as well as a video of the administration and results of the unreliable Voice Stress Analyzer test ("VSA") violated Petitioner's rights under the Due Process Clause. (Petition at 1-8.)[4] The government responds that habeas relief is unwarranted as: (1) pre-trial due process violations cannot be the basis of vacating a later conviction and, alternatively, the California Court of Appeals reasonably found that the magistrate judge in Petitioner's case was both neutral and detached; (2) Petitioner failed to exhaust all claims for relief based on hearsay except claims for Confrontation Clause violations by admission of out-of-court statements by witness Rodriguez, and Rodriguez testified and was subjected to cross-examination such that it would not

---

[4] Because Petitioner uses a unique numbering system for the pagination of his Petition, to minimize confusion, the Court adopts for purposes of this Order, a sequential numbering system starting from handwritten page "-1-" of the Petition.

United States District Court
For the Northern District of California

implicate the Confrontation Clause; and (3) Petitioner failed to exhaust his claim for admission of the VSA into evidence, Macias' out-of-court statements were not coerced and, alternatively, admission of coerced statements would not violate Petitioner's due process rights. (Answer at 1-53.) The Court addresses each ground in turn.

**A. Judge's Neutrality**

At issue is whether the magistrate judge that issued Petitioner's arrest warrant and presided over Petitioner's bail proceedings, denying Petitioner release on bail, was neither neutral nor detached in violation of Petitioner's due process rights and whether such a violation would afford Petitioner habeas relief of his post-trial conviction.[5] (Petition at 1.) Specifically, Petitioner contends that Judge Morse was not neutral because she is married to the lieutenant in the Santa Cruz County Sheriff's Office who oversaw the murder investigation involving Petitioner and had previously socialized with the officer, Sergeant Deverell, who requested the warrant. (Id. at 1-2)

It is well-established that pursuant to the Fourth and Fourteenth Amendments, a citizen is entitled to a "neutral and detached" magistrate, specifically one that has no direct, personal, substantial, pecuniary stake in the outcome of the case, in the issuance of a warrant. Connally v. Georgia, 429 U.S. 245, 250-51 (1977). Recognition of this right was a natural extension of an earlier recognition that the Due Process clause provides the right to "an impartial and disinterested tribunal in both civil and criminal cases." Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980); Connally, 429 U.S. at 250 (quoting Ward v. Village of Monroeville, Ohio, 409 U.S. 57, 61-62 (1972)). However, the Supreme Court has yet to recognize that failure to provide a "neutral and detached" magistrate for bail proceedings violates a defendant's due process rights. Moreover, while the Court has recognized a due process right to impartiality in pretrial proceedings, it is an established rule that violation of pretrial rights, without more, is insufficient to vacate a subsequent, valid conviction. U.S. v. Crews, 445 U.S. 463, 474 (1980); Gerstein v. Pugh, 420 U.S. 103, 119 (1975) ("Nor do we

[5] In its Order to Show Cause, the Court dismissed Plaintiff's claim for violation of his Fourth Amendment rights due to the magistrate judge's alleged bias as barred by the Supreme Court's decision in Stone v. Powell, 428 U.S. 465 (1976). (Docket Item No. 2 at 2.)

retreat from the established rule that illegal arrest or detention does not void a subsequent conviction.").

Here, assuming *arguendo* that Petitioner had met his burden to show that the magistrate judge that presiding over the issuance of his arrest warrant and his bail proceedings was not neutral and detached, such a pretrial violation of Petitioner's constitutional rights could not serve as a basis to vacate his port-trial conviction without a showing that the pretrial violation resulted in due process violations at trial. Crews, 445 U.S. at 474. Petitioner has not made such a showing.

Moreover, the Court of Appeal properly identified the applicable Supreme Court due process precedent, and Petitioner does not contend otherwise.[6] Additionally, the Court of Appeal's application of that precedent was not objectively unreasonable. Judge Morse's husband was not the affiant that sought Petitioner's arrest warrant; rather, Sgt. Deverell communicated with Judge Morse about both Petitioner's warrant and bail. (Appeal at 38-39.) Although Sgt. Deverell did work in the same Sheriff's Department as Judge Morse's husband, there was no evidence that Judge Morse ever socialized with Sgt. Deverell. (Id. at 39.) Nor did Judge Morse have any pecuniary interest in the outcome of Petitioner's arrest or bail, or otherwise know or participate in the investigation of Petitioner's case. (Id. at 23-24, 39.) Instead, Judge Morse's husband specifically testified that he and his wife "made [it] a practice over the years that if there's a case that I feel may involve her court in any way, that we intentionally do not discuss these cases." (Id. at 21.) After a lengthy analysis of this evidence, the Court of Appeal determined that Petitioner's contention that Judge Morse was biased was "simply too speculative to be convincing." (Id. at 42.) Given the attenuated nature of Petitioner's claim, the Court finds that the Court of Appeal did not unreasonably apply the law to the facts of Petitioner's case.

Petitioner contends that Judge Morse's denial of bail establishes in and of itself that she was not neutral. (Petition at 2.) However, Petitioner cites no authority for such a contention, and the

[6] (Appeal at 32-44; Memorandum of Points and Authorities in Support of Traverse by Adrian Melgoza at 8-11, hereafter, "Traverse," Docket Item No. 66 (citing same cases as noted by Court of Appeal).)

United States District Court
For the Northern District of California

Court is unaware of any. In fact, Petitioner based this claim in state court on his assertion that Judge Morse had granted bail to a defendant similarly situated, but the record refuted that assertion, as Judge Morse had also set no bail in another similar case for a conditional sentence violation that concerned gang involvement. (Appeal at 29-30.) A former probation officer who worked with Judge Morse also testified that the Judge routinely granted no-bail warrant requests in Watsonville, and would treat the violation of associating with other gang members as "a particularly serious violation." (Id. at 30) Finally, even assuming, *arguendo*, that the denial of bail amounted to constitutional error due to bias, Petitioner has not made a showing that the denial affected the jury's verdict at trial. Crews, 445 U.S. at 474. Thus, Petitioner cannot claim any prejudice.

Accordingly, the Court DENIES Petitioner's Petitioner for Writ of Habeas Corpus on the ground that he was not afforded a neutral and detached magistrate.

**B. Admission of Certain Out-Of-Court Statements**

**1. Exhaustion**

As a threshold matter, the Court examines whether Petitioner has failed to exhaust any of his claims for habeas relief and, thus, procedurally defaulted on those claims by failing to raise them in his petition to the California Supreme Court for review.

As codified in 28 U.S.C. § 2254(b)(1), an application for habeas relief under Section 2254 shall not be granted unless "the applicant has exhausted the remedies available in the courts of the State . . . ." The Supreme Court has held that, to satisfy Section 2254's exhaustion requirement, a petitioner must seek review in the state's court of last resort, even if the court of last resort retains discretion to grant such a review. O'Sullivan v. Boerckel, 526 U.S. 838, 842-49 (1999). In a related doctrine, the Court has held that failure to meet a state's procedural requirements in order to properly raise and, thus, exhaust federal claims results in an independent and adequate state ground of "procedural default" that bars a petitioner from habeas relief as to those claims "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 731-32, 750 (1991). While a

United States District Court
For the Northern District of California

petitioner who had defaulted on federal claims would arguably have exhausted all available state remedies, the Court found the procedural default doctrine a necessary step in order to protect the exhaustion requirement from easy circumvention by intentional procedural default. Id. In the context of failing to raise claims for review by a state's court of last resort, a petitioner must raise all claims in order to "properly" exhaust all state remedies and failure to do so results in procedural default of unraised claims. O'Sullivan, 526 U.S. at 848-49.

Here, upon review of the record, the Court finds that Petitioner did not exhaust the constitutional challenge to admission of all hearsay statements, save those admitted from witness Rodriguez. (Answer at 37, 46; Traverse at 6-8.) Thus, insofar as these claims are now barred by state procedural rules,[7] Petitioner has procedurally defaulted on these claims. Coleman, 501 U.S. at 731-32. The Court now turns to address Petitioner's remaining claim.

**2. Out-of-Court Statements by Witness Rodriguez**

At issue is whether Petitioner's rights to confrontation and due process were violated by the admission of certain out-of-court statements made by Mario Rodriguez. (Petition, Ex. 1 at 3-5.)

**a. Confrontation Clause**

At issue is whether the admission of out-of-court statements by witness Rodriguez to Esmeralda Sanchez, Alma Pinon, Juan Carlos Rocha, Inspector Castellanos and Detective Plageman in conjunction with limitations on cross- and direct-examination of witness Rodriguez's later testimony violated Petitioner's right to confrontation. (Petition at 3-5.)

The Confrontation Clause bars the admission of out-of-court testimonial statements, unless the declarant is both unavailable and was previously available for cross-examination. Crawford v. Washington, 541 U.S. 36, 68 (2004). However, admission of out-of-court statements, testimonial or otherwise, does in no way implicate the Confrontation Clause when the declarant appears at trial and subjects himself to cross-examination in order to defend or explain the statement. Id. at 59 n. 9. While the Confrontation Clause guarantees the opportunity for cross-examination, in all but

---

[7] (Traverse at 6-8 (citing In re Waltreus, 62 Cal. 2d 218, 225 (Cal. 1965); In re Dixon, 41 Cal. 2d 756, 759 (Cal. 1953).)

"extraordinary cases" courts must abstain from inquiry into whether a petitioner has achieved "effective" cross-examination. Delaware v. Fensterer, 474 U.S. 15, 20 (1985).

Here, the Court of Appeal correctly concluded that there was no Confrontation Clause violation because Rodriguez testified at trial and was subject to cross-examination. (Appeal at 50-51.) Although Rodriguez was initially unavailable and his out-of-court testimonial statements were admitted based on that unavailability, he was later located and directed by the state trial court to appear for cross-examination. The trial court limited cross-examination to matter within the scope of direct examination in compliance with the California Evidence Code. Cal. Evid. Code §§ 761, 773. The facts of this case present a somewhat unique circumstance from that contemplated in Crawford, insofar as witness Rodriguez's statements were admitted at a prior time when he was unavailable and then, once he was subsequently located, he was called to the stand to answer for his statements. However, Petitioner was afforded the opportunity to call Rodriguez as a witness for the defense and did indeed call him to the stand. During that time, as noted by the Court of Appeal, Petitioner "undertook extensive questioning" of Rodriguez, unrestricted by the limitations imposed on cross-examination by the California Evidence Code. (Appeal at 49.) In light of witness Rodriguez appearance at trial and Petitioner's opportunity to examine him, the Court of Appeal correctly concluded that admission of Rodriguez's out-of-court testimonial statements did not implicate the Confrontation Clause.

Accordingly, the Court DENIES Petitioner's Petitioner for Writ of Habeas Corpus on the ground that admission of witness Rodriguez out-of-court testimonial statements was in violation of the Confrontation Clause.

**b. Due Process**

At issue is whether the admission of out-of-court statements by witness Rodriguez in conjunction with limitations on cross- and direct-examination of witness Rodriguez's later testimony violated Petitioner's due process rights. (Petition at 3-5.)

It is well-settled law that rulings on evidentiary matters by a state trial court, even if erroneous, may only be used as a basis for relief under Section 2254 if the ruling "renders the state proceedings so fundamentally unfair as to violate due process." Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999) (citing Hill v. United States, 368 U.S. 424, 428 (1999)). A ruling to admit evidence by a state trial court only renders the state proceedings fundamentally unfair when "there are *no* permissible inferences the jury may draw from the evidence . . . ." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). Moreover, even evidence admitted in which there are no permissible inferences that a jury may draw must also "be of such a quality as necessarily prevents a fair trial." Id. (quotations omitted).

In this case, the probative value of Rodriguez's out-of-court statements and his testimony at trial regarding his personal experience of the "junta" meeting and facts identifying Petitioner as a participant in the murder is clear. Moreover, Petitioner fails to satisfy his burden of supplying any impermissible inferences that the jury could have drawn from the admission of witness Rodriguez's testimony. As discussed previously, Rodriguez testified at trial. Petitioner was afforded the opportunity to cross-examine Rodriguez, including providing evidence to impeach his testimony, and to call him to the stand as a defense witness. (Appeal at 47-50.) Thus, the Court of Appeal correctly concluded that the admission of Rodriguez's testimony did not render the state proceedings fundamentally unfair. The Court finds that the Court of Appeal's rejection of Petitioner's due process claim was not unreasonable.

Accordingly, the Court DENIES Petitioner's Petition for Writ of Habeas Corpus on the ground that admission of witness Rodriguez out-of-court testimonial statements was in violation of the Petitioner's right to due process.

**C. Macias' Out-of-Court Statements and the VSA Results**

**1. Exhaustion**

As a threshold matter, the Court examines whether Petitioner has failed to exhaust his claims for constitutional violations in the admission of the VSA results and, thus, procedurally defaulted on that claim by failing to raise it in his petition to the California Supreme Court for review.

Upon review of the record, the Court finds that Petitioner did not exhaust the constitutional challenge to admission of the VSA results. (Answer at 37, 46; Traverse at 6-8.) In his Traverse, Petitioner contends that the claim for due process violations based on admission of VSA results was so intertwined with his claim for due process violations based on admission of Macias' coerced statement such that the raising of the latter claim in his petition for review to the California Supreme Court inherently raised the former, thus, exhausting both claims. (Traverse at 28.) However, the Supreme Court has held that, to satisfy Section 2254(b)(1)'s exhaustion requirement, a petitioner "must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." O'Sullivan, 526 U.S. at 842. This requirement includes raising those claims before the state court of last resort, despite any system of discretionary review. Id. at 848. Petitioner now urges the Court to adopt the proposition that claims may be properly raised before the state court of last resort by inference; specifically, that unraised claims considered a natural correlative to raised claims should be found to have properly afforded "the state courts an opportunity to act." (Traverse at 28.)

The Court finds this proposition unduly extends the doctrine. In particular, allowing petitioners to raise claims by inference would contravene the purpose of the exhaustion doctrine as codified in Section 2254(b)(1); namely, to afford state courts a clear opportunity to correct federal constitution errors prior to intervention by the federal courts. In this case, Petitioner raised admission of the VSA results as a separate claim to the Court of Appeals, but omitted that claim in his petition for review to the California Supreme Court. (Appeal at 69-73.) The California Supreme Court subsequently denied discretionary review. (Answer, Ex. I.) Had Petitioner raised that claim in his petition to the California Supreme Court, the Court could have found that claim as a ground to grant review. To hold otherwise, and require state supreme courts review each petition for appeal not only for raised claims, but all unraised claims that could be considered correlative–including those claims raised in prior appeals and then abandoned–would effectively vitiate the exhaustion doctrine as delineated in O'Sullivan. Thus, the Court finds that Petitioner's raising of his claim for

United States District Court
For the Northern District of California

due process violations based on admission of Macias' coerced out-of-court statements is insufficient to raise his claim for due process violations based on admission of the VSA results.

Accordingly, insofar as this claim is now barred by state procedural rules,[8] Petitioner has procedurally defaulted on this claim. Coleman, 501 U.S. at 731-32. The Court now turns to address Petitioner's remaining claim.

**2. Macias' Out-of-Court Statements**

At issue is whether Macias' out-of-court statements were coerced and whether admission of these statements rendered Petitioner's trial fundamentally unfair in violation of Petitioner's right to due process. (Petition at 6-8.)

The Supreme Court has recognized that when the prosecution in a criminal case "knowingly use[s] false testimony which was extorted from a witness 'by violence and torture,' one convicted may claim the protection of the Due Process Clause against a conviction based on that testimony." Hysler v. State of Florida, 315 U.S. 411, 413 (1942). However, the Supreme Court has yet to address whether the mere admission of coerced testimony by a third-party at trial, irrespective of falsity and unreliability, is itself a violation of the Due Process Clause. Samuel v. Frank, 525 F.3d 566, 569 (2008). Some courts, including the Ninth Circuit, citing to law prior to the passage of the AEDPA, have recognized such a right in the context of a convicted's right to fair trial and, as such, require a showing that the coerced third-party statements were false or unreliable to the extent that admittance of the statements rendered the state proceedings fundamentally unfair. U.S. v. Gonzales, 164 F.3d 1285, 1289 (10th Cir. 1999); Williams v. Woodford, 384 F.3d 567, 593 (9th Cir. 2002); United States v. Chiavola, 744 F.2d 1271, 1273 (7th Cir. 1984); United States v. Merkt, 764 F.2d 266, 274 (5th Cir. 1985); La France v. Bohlinger, 499 F.2d 29, 34 (1st Cir. 1974). While these cases rely on pre-AEDPA law, prior to the requirement that Section 2254 habeas relief rest solely on violations of "clearly established" federal law as determined by Supreme Court precedent, the cases appear to rely on the well-settled principle that erroneous admissions of evidence by a state trial

---

[8] (Traverse at 6-8 (citing In re Waltreus, 62 Cal. 2d 218, 225 (Cal. 1965); In re Dixon, 41 Cal. 2d 756, 759 (Cal. 1953).)

United States District Court
For the Northern District of California

court that render the state proceedings "fundamentally unfair" offend basic principles of due process. Hill, 368 U.S. at 428. Notably, however, these cases do not address the admission of a false third-party coerced statement in the context of Hysler. 315 U.S. at 413.

Here, Petitioner's claim fails for lack of "clearly established Federal law." Stevenson, 384 F.3d at 1071 (quotations omitted). Although the Supreme Court has spoken to a due process right against the admission of false coerced third-party testimony, even assuming *arguendo* that the statements were coerced, the Court finds that Petitioner has failed to make any showing that witness Macias' out-of-court statements were false and that the prosecution had knowledge of the falsity to bring this particular case into the purview of Hysler. 315 U.S. at 413. In addition, Petitioner has failed to make a showing that playing the videotape of Macias' out-of-court testimony rendered his trial "fundamentally unfair." In particular, Macias appeared at trial for cross-examination regarding his out-of-court testimony and the police interrogation techniques; a fact that courts have recognized safeguards admission of such statements against a due process violation. Nasrichampang v. Woodford, 288 Fed. Appx. 367, 368 (9th Cir. 2008) (quoting Williams v. Woodford, 384 F.3d 567, 596 (9th Cir. 2004)). Moreover, while on the stand at trial, Macias actually disclaimed his earlier out-of-court statements; clearly stating that his testimony regarding Petitioner's involvement in the murder "was a lie." (Appeal at 60.) Thus, the Court finds that the Court of Appeal's rejection of Petitioner's due process claim for admission of Macias' out-of-court statements was not unreasonable.

Accordingly, the Court DENIES Petitioner's Petition for Writ of Habeas Corpus on the ground that admission of witness Macias' out-of-court testimonial statements was in violation of the Petitioner's right to due process.

**D. Certificate of Appealability**

At issue is whether the Court should issue a certificate of appealability.

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009). To

United States District Court
For the Northern District of California

obtain a certificate of appealability, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Specifically, if a court denies a petition, a certificate of appealability may only be issued "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003); see also Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338. The Ninth Circuit recently described this standard as lenient. See Hayward v. Marshall, 603 F.3d 546 (9th Cir. 2010) (*en banc*).

Here, the Court finds that Petitioner has not made a substantial showing of the denial of his rights to due process and confrontation. Reasonable jurists could not disagree with the Court of Appeal's holding that Petitioner's rights to due process and confrontation were not violated. There is little room for disagreement that the Court of Appeal applied the relevant case law with respect to Judge Morse's alleged bias and reasonably concluded that Petitioner's claim was too speculative. Additionally, reasonable jurists could not disagree with the Court of Appeal's holding that there was no confrontation clause or due process clause violations where Rodriguez's out-of-court statements were tested at trial by Petitioner's counsel on both direct and cross-examination. Finally, the Court of Appeal reasonably concluded that the admission of Macias' statements to police did not amount to a due process violation.

Accordingly, the Court will not issue a certificate of appealability.

## V. CONCLUSION

The Court DENIES the Petition for Writ of Habeas Corpus as to all claims. A certificate of appealability will not be issued. Judgment shall be entered accordingly.

Dated: 10/12/12

EDWARD J. DAVILA
United States District Judge

United States District Court
For the Northern District of California

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Gregory A. Ott gregory.ott@doj.ca.gov
Jonathan David Soglin jsoglin@fdap.org

**Dated:** 10/15/2012

**Richard W. Wieking, Clerk**

**By:** ______________________
**Elizabeth Garcia**
**Courtroom Deputy**

FILED

OCT 15 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

Adrian Melgoza,

Petitioner,

v.

Richard Kirkland,

Respondent.
_______________________________________/

NO. C 06-04861 EJD

**JUDGMENT**

Pursuant to the Court's Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability, judgment is entered in favor of Respondent Warden Richard Kirkland against Petitioner Adrian Melgoza. A certificate of appealability will not be issued.

The Clerk shall close this file.

Dated: 10/12/12

EDWARD J. DAVILA
United States District Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Gregory A. Ott gregory.ott@doj.ca.gov
Jonathan David Soglin jsoglin@fdap.org

**Dated:** Oct. 15 2012

**Richard W. Wieking, Clerk**

**By:** ______________________
**Elizabeth Garcia**
**Courtroom Deputy**

United States District Court
For the Northern District of California